Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 188 | **DATE** | 4/8/2002 |
| **CASE TITLE** | Carol Friend vs. Margaret Lalley | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant Lalley's motion for summary judgment [28-1] is granted. Defendant Lalley's motion to strike [34-1] is denied as moot. Judgment is entered in favor of defendant Margaret Lalley and against plaintiff Carol Friend. This case is hereby dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | APR 09 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 36 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| RO | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CAROL FRIEND,<br><br>Plaintiff,<br><br>v.<br><br>MARGARET LALLEY, individually and<br>as principal of Dawes Elementary School,<br><br>Defendant.[1] | No. 01 C 188<br><br>Judge Ruben Castillo |

## MEMORANDUM OPINION AND ORDER

Plaintiff Carol Friend sues Defendant Margaret Lalley, principal of Dawes Elementary School ("Dawes"), under 42 U.S.C. § 1983. Friend alleges that Lalley violated her First Amendment rights by terminating her employment at Dawes because Friend voiced concerns about mismanagement of student discipline and the general health and safety of the children at Dawes. Currently before the Court is Lalley's motion for summary judgment. For the reasons stated below, the motion is granted. (R. 28-1.)

### RELEVANT FACTS

Friend worked at Dawes as a Parent Volunteer Program ("PVP") participant from 1996 until May 13, 1999. At the time of the events giving rise to this controversy – the winter and spring of 1999 – Lalley was employed as the principal of Dawes, a Chicago public school. Also at this time, Friend's son was a student at Dawes.

Friend began working with the PVP in 1996 as an unpaid volunteer. During the following two school years, she was paid $10.00 a day for two hours of service. Friend contends

---

[1] The Court has omitted Defendant Chicago Board of Education from the caption as the complaint against it was dismissed with prejudice. (*See* R. 29, Jan. 10, 2002 Order.)

that her motivation for becoming a parent volunteer was to be involved in her son's life, the school, the community and to be of assistance to teachers. (R. 28-3, Def.'s Mot. for Summ. J., Ex. B, Friend Dep. at 24.) Friend's duties included, but were not limited to, working on bulletin boards, assisting with grade books, taking students to the bathroom and lunchroom, grading papers and planning and supervising craft activities for the classrooms. (R. 31, Pl.'s Facts ¶ 9.) Friend also volunteered additional time at Dawes, performing activities similar to those above, as well as being in charge of the school laundry room. (*Id.* at ¶ 10.)

The PVP program was created to increase parent involvement in the school. Parent volunteers were asked to refrain, however, from involvement in any other areas of school life outside of their work responsibilities. Specifically, PVP participants were told that they should not involve themselves with their children while performing their assigned tasks, and they were forbidden from asking teachers or other staff for personal information about other children.

Friend's son, who is Caucasian, had problems with peer interpersonal relationships at Dawes. Friend alleges that many of these problems were attributable to race. Friend testified that from the time in which her son first enrolled at Dawes, the school had gone from being predominantly white to predominantly non-white. Friend contends that the "most serious incidents" involving her son and other school children occurred during the winter and spring of 1999. (*Id.* at ¶ 39.) On January 26, 1999, Friend's son was disciplined for calling another classmate "a stupid nigger." (R. 28-2, Def.'s Facts ¶ 22). Friend denies that her son made the racial slur. (R. 31, Pl.'s Facts ¶ 22.) On February 5, 1999, the student who allegedly was the target of the racial slur was disciplined for stabbing Friend's son with a pencil. On April 12, 1999, Friend's son was again disciplined for purportedly writing a racial slur and a classmate's

2

telephone number on a piece of paper that he made into an airplane. (R. 28-2, Def.'s Facts ¶ 25.) Friend again denies that her son wrote the racial slur. (R. 31, Pl.'s Facts ¶ 25.)

When there are issues of student misconduct, Dawes officials follow the procedures set forth in the Chicago Public Schools' Uniform Discipline Code ("UDC"). The UDC is a system of progressive student discipline. Lalley maintains that the UDC provides for flexibility in the application of discipline. (R. 28-2, Def.'s Facts ¶ 30.) Friend maintains that no flexibility is allowed where a student uses a weapon, which is defined by the UDC as "any object that is capable of inflicting bodily harm, and/or an object that is used in a manner that threatens violence even though its normal use is not as a weapon." (R. 31, Pl.'s Facts ¶ 30.) Friend alleges that for such misconduct, the UDC provides minimum to maximum disciplinary action of "police notification and/or arrest, suspension for 10 days . . . ." (*Id.*) Friend maintains that the student who stabbed her son with a pencil should have been arrested and suspended for ten days. (*Id.* at ¶ 31.) Friend also testified that she believed the punishments that her son received were unfair and were motivated by Lalley's worry of upsetting parents of African-American students.

In May 1999, a series of events occurred ending with Friend's termination as a PVP participant. The student, who was the target of the purported racial slur and who previously stabbed Friend's son with a pencil, threatened to again stab Friend's son with a pencil or pen. In addition, two Dawes' students jumped Friend's son.[2] At Friend's request, Lalley handled the May 1999 incidents in collaboration with the Chicago Police Department. As Lalley explained in a letter to the Local School Council ("LSC"), she believed the incidents were properly resolved after she conducted meetings with police officers and the children involved and after

---

[2] During the alleged jumping, a student grabbed Friend's son by his bookbag and spun him around. (*See* R. 28-3, Def.'s Mot. for Summ. J., Ex. D, Lalley Dep. at 18.)

3

she took appropriate disciplinary measures against the children. (R. 28-3, Def.'s Mot. for Summ. J., Ex. M, Lalley's Letter to the LSC.) Friend believed that the punishment was "totally inappropriate." (R. 31, Pl.'s Facts ¶ 37.) Therefore, Friend filed a police report against the child who threatened to stab her son with a pen or pencil. (R. 31, Pl.'s Add'l Facts ¶ 1.) As a result, police officers came to Dawes on May 12, 1999 and arrested the children involved with making threats to and jumping Friend's son. Mary Dixon, the PVP Coordinator at Dawes, maintains that Friend came to watch the children being arrested, which Dixon thought would make it difficult for the students to respect Friend while she was working as a PVP participant. (R. 28-2, Def.'s Facts ¶ 51.) Friend maintains that she came to the school during the arrest because the police asked her to identify the students. (R. 31, Pl.'s Facts ¶ 51.) Friend testified that, at the police station, Lalley told the police, the parents of the children and others that Friend was "nuts." (R. 31, Pl.'s Add'l Facts ¶ 3.) Friend was terminated from her position on May 13, 1999.

Friend testified that the incidents during the winter and spring of 1999 motivated her to speak out about mismanagement of student discipline at Dawes, that she spoke out every time an incident involved her son and that the reason she began to speak out was because she wanted the alleged abuse of her son to stop. (R. 31, Pl.'s Facts ¶ 39-41.) Friend voiced her concerns about mismanagement of discipline at private meetings with Lalley, at meetings with other school administrators, including the vice-principal, and at meetings with Lalley and the Chicago Police Department. Friend also maintains that she stated similar concerns at the Chicago Police Station on May 12, 1999. In addition, Friend spoke to the vice-principal of Dawes about an incident involving a teacher and student in what she believed to be an inappropriate situation. (R. 30, Pl.'s Resp to Def.'s Mot. for Summ. J., Ex. A, Friend Dep. at 41.) In response to this complaint,

4

Friend testified that Lalley told her that the incident had been investigated and that the situation was harmless. (*Id.*) Although not satisfied with Lalley's response, Friend decided not to pursue the issue further. (R. 28-3, Def.'s Mot. for Summ. J., Ex. B, Friend Dep. at 42.) Friend testified that she did not raise this incident to the police on May 12, 1999. (*Id.* at 70.)

Lalley alleges various concerns with Friend's job performance. As evidence, Lalley offers Dixon's statements that Friend often left her assigned duties to participate in deliberations regarding student discipline. (R. 28-2, Def.'s Facts ¶ 47.) Friend, in turn, alleges that she always received permission to leave her tasks and always made up the time. (R. 31, Pl.'s Facts ¶ 47.) The parties also dispute whether Friend asked school officials for personal information regarding the children involved in incidents with her son, which, if true, would violate a written prohibition for PVP workers. (R. 28-2, Def.'s Facts ¶ 48; R. 31, Pl.'s Facts ¶ 48.) Dixon recommended Friend's termination based upon her concern that it would be difficult for the children who watched Friend witness the arrest to maintain respect for her as a PVP participant. (R. 28-3, Def.'s Mot. for Summ. J., Ex. C. Dixon Aff. at 3.)

Since her termination from Dawes, Friend has not worked for or applied for employment with the Chicago Board of Education. (R. 31, Pl.'s Facts ¶ 54.) She has applied for one job since her termination and has turned down one job offer. (*Id.* ¶ 55-56.) Currently before the Court is Lalley's motion for summary judgment. For the following reasons, Lalley's motion is granted.

5

## LEGAL STANDARDS

Summary judgment is appropriate if the record indicates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable inferences are to be made in favor of the nonmoving party. *Id.* at 255. In order to survive a motion for summary judgment, however, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial." *Gleason v. Mesirow Fin. Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This must be done with reasonable particularity, since it is not the task of the Court to "scour the record in search of a genuine issue of triable fact." *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995). The Court need not defeat a motion for summary judgment due to "the mere existence of *some* alleged factual dispute between the parties," *Liberty Lobby*, 477 U.S. at 247, or the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. In short, the Court must decide "whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1573 (7th Cir. 1989).

## ANALYSIS

Friend claims that Lalley terminated her employment in retaliation for publicly voicing concerns about student discipline and the general health and safety of the children at Dawes, thus violating her First Amendment right to free speech.[3] Lalley asserts that Friend's suit cannot survive summary judgment because Friend did not engage in constitutionally protected speech. Lalley first argues that Friend's speech was not of public concern.

It is well-settled that a citizen does not forfeit her First Amendment right to comment upon matters of public concern by virtue of accepting government employment. *Connick v. Myers*, 461 U.S. 138, 140 (1983). Public employment cannot be conditioned on a basis that infringes an employee's constitutionally protected interest in freedom of speech. *Id.* at 142. Nevertheless, as an employer, the state has additional interests in regulating the speech of its employees that differ considerably from its interests in regulating the speech of its citizens in general. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Specifically, the state's interest in "achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as a sovereign to a significant one when it acts as employer." *Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1013 (7th Cir. 1997) (citing *Waters v. Churchill*, 511 U.S. 661, 675 (1994)). The state employer must have the "prerogative to remove employees

---

[3] It is not clear whether Friend intended to allege a liberty interest by titling her argument "Plaintiffs' [sic] Complaints were Constitutionally Protected under the First and Fourteenth Amendments," (*See* R. 30, Pl.'s Resp. to Def.'s Mot. for Summ. J.), or whether Friend was merely stating the Fourteenth Amendment for purposes of incorporation. We have, however, considered the issue of a liberty interest, and we find that Friend has not made a proper showing to survive a motion for summary judgment. In particular, Friend has not shown that she suffered a tangible loss of other employment opportunities. *Head v. Chi. Sch. Reform Bd. of Trs.*, 225 F.3d 794, 801 (7th Cir. 2000). Friend did not demonstrate that Lalley's actions made it impossible for Friend to acquire another position in her chosen field, because she has sought only one position since her termination and has not applied with the Chicago Public Schools.

whose conduct hinders efficient operation and to do so with dispatch." *Connick*, 461 U.S. at 151.

The *Pickering* Court recognized the competing concerns of government employers and employees when it weighed a public school board's interest in requiring that its teachers not publicly and inaccurately air criticisms regarding school administrators against a teacher's interest in publicizing such criticisms in a local newspaper. *Pickering*, 391 U.S. at 568-70. In addressing these competing interests, the *Pickering* Court advised courts to "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs." *Id.* at 568. Thus, for Friend's speech to be protected: (1) her speech must be a matter of public concern; and (2) her interest in the speech must not be outweighed by Lalley's interest in promoting efficient and effective public service. *See Waters*, 511 U.S. at 668. Inquiry into the status of speech is a matter of law and not fact. *Connick*, 461 U.S. at 148. The application of the *Pickering* balance, described as "fuzzy" by the Seventh Circuit, is made on a case-by-case basis. *Khuans*, 123 F.3d at 1014 (citation omitted).

**I. Public Concern**

Friend argues that her speech was a matter of public concern. She points to several instances where she contends that she spoke out on matters of public concern: (1) numerous discussions during the winter and spring of 1999 between Friend, Lalley and other administrators at Dawes regarding discipline meted out due to conflicts between her son and other students; (2) her speech at a police station regarding similar issues; and (3) one incident in which she voiced concerns about the health and safety of a student other than her son.[4]

---

[4] Friend alleges in her complaint, but does not re-allege in her response, that she spoke publicly at a LSC meeting regarding discipline at Dawes. We have considered this speech, but we deem it

8

In determining whether Friend's speech was constitutionally protected, we first examine whether her speech was a matter of public concern. Although citizens are undoubtedly interested in how their government operates its affairs, "to presume that all matters which transpire within a government office are of public concern would mean that virtually every remark – and certainly every criticism directed at a public official – would plant the seed of a constitutional case." *Connick*, 461 U.S. at 149. To avoid this outcome, the Supreme Court held that when a public employee speaks only upon matters of personal interest, and not public concern, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147.

The inquiry into public concern involves delving past the general subject matter of the speech in question in order to examine "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48. Of these factors, content is the most important. *Smith v. Fruin*, 28 F.3d 646, 651 (7th Cir. 1994) (citing *Yoggerst v. Hedges*, 739 F.2d 293, 296 (7th Cir. 1984)). The Seventh Circuit has also emphasized the importance of determining the motivation of the speaker in making the questioned speech. *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir. 1985) (a court must look at the "*point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?"). Speech intended to further the private interest of an employee or to air a personal employee

---

irrelevant to Friend's retaliation claim as it occurred after Friend's termination from Dawes. In addition, Friend alleges in her complaint and response that she voiced concerns about witnessing a scene of teacher-on-student violence at Dawes approximately one year before her termination. Again, we have considered this speech and find that there is insufficient evidence in the record to reasonably infer any connection between this speech and Friend's termination.

grievance does not warrant First Amendment protection, even if the speech addresses issues of public interest. *Khuans,* 123 F.3d at 1016-17 (holding that a school psychologist's speech alleging her supervisor's failure to follow mandates in the Individuals with Disabilities Education Act would be an issue of public concern if the entire content of the plaintiff's speech had not pointed toward advancing personal interests); *Fruin,* 28 F.3d at 651-53 (holding that a police detective's complaints about second-hand smoke in the workplace was not an issue of public concern when raised solely because of his own sensitivity to smoke).

While Friend's speech regarding the mismanagement of student discipline at Dawes is an issue of public interest, when viewed in light of the whole record, it cannot be deemed to be anything more than a private employee grievance. The context and motivation of Friend's speech indicates its personal nature. Friend maintains that the "most serious incidents" involving her son and the other children occurred during the winter and spring of 1999. (R. 31, Pl.'s Facts ¶ 38.) She testified that these incidents motivated her to speak out about student discipline, that she spoke out every time an incident involved her son and that the reason she did so was because she wanted these incidents to stop. (*Id.* at ¶ 39-41.) Friend testified that she believed her son was being punished unfairly, and that the punishment meted out to the children involved in incidents with her son was wholly inappropriate. (*Id.* at ¶ 36-37.) Friend's private discussions with Lalley and other school administrators as well as her discussion at the police station regarding mismanagement of discipline issues at Dawes occurred during a time of escalated incidents involving her own son. Her motivation was clearly to improve the situation of her son rather than the situation of the community in general. Friend's parental desire to correct a potential discipline abuse involving her son is certainly understandable. It does not, however,

trigger the protection of the First Amendment.

Friend also alleges that she voiced concerns to the vice-principal of Dawes after witnessing a teacher in a potentially inappropriate situation with a student. (R. 30, Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. A, Friend Dep. at 41.) Friend further testified that, on the same day, Lalley told her that the incident had been investigated and that the situation was harmless. (*Id.*) Although not satisfied with Lalley's response, Friend decided not to pursue the issue. (R. 28-2, Def.'s Mot. for Summ. J., Ex. B, Friend Dep. at 42.) Bringing an actual or potential wrongdoing to light during the provision of service is undoubtedly in the interest of the public. *Khuans,* 123 F.3d at 1016. In this situation, however, the record is devoid of important detail. Specifically, Friend did not indicate when this speech occurred, other than to state in her deposition stating that she did not raise this incident to the police on May 12, 1999. (R. 28-2, Def.'s Mot. for Summ. J., Ex. B, Friend Dep. at 70.) The closer this incident was temporally to Friend's termination, the more reasonable it would be to infer that this incident was a motivating cause of the termination. Friend, however, has not supplied such information here. Since context is an important determinative element in assessing the nature of speech, it is essential that a plaintiff detail the elements of her speech with at least some degree of specificity. *See Hartman v. Bd. of Trs. of Cmty. Coll. Dist.,* 4 F.3d 465, 471 (7th Cir. 1993).

Even if the record were more elaborative of this allegedly inappropriate teacher-student situation, we find that it would not be enough to characterize Friend's speech as a matter of public concern. While Friend claims that she was primarily motivated by the health and safety of the children in the school, (*See* R. 30, Pl.'s Resp. to Def's Mot. for Summ. J.), the record clearly indicates that the majority of Friend's speech focused on issues pertaining to her son. This

11

allegedly inappropriate teacher-student incident represents the sole situation in which Friend voiced concern about an issue exclusive of her son. When Friend got an explanation from Lalley that she deemed unsatisfactory, Friend did not pursue the matter with an outside authority, such as the police, as she did in the incidents involving her son. Instead, she decided not to pursue the issue further. Friend's response illustrates that her interest in her speech cannot reasonably be construed as motivated by the general health and safety of the children at Dawes. Rather, it was clearly motivated, and understandably so, by Friend's concern for the welfare of her son. Furthermore, when a plaintiff's speech is plainly individual in focus, one statement that could possibly be of public concern will not be enough to transform the plaintiff's speech into a matter of public concern. *Khuans*, 123 F.3d at 1016-17 (stating that plaintiff's "tidbit of speech on a matter of public concern" is not enough to offset a "bagful of complaints" that are personal in nature); *Smith*, 28 F.3d at 652-53 (stating that single remarks in a deposition that could be read to reflect matters of public concern are not enough to counter the plainly individual focus of the plaintiff's complaints). Therefore, after thoroughly examining all of Friend's speech, we find that her speech was personal in nature, did not touch upon matters of public concern and, as such, is not constitutionally protected.

## II. Effects of Speech

Even assuming arguendo that Friend's speech was not of public concern, it still would not satisfy the *Pickering* balancing test given the effects of Friend's speech. Friend argues that her speech did not interfere with her duties as a PVP participant, because she always received permission to leave her PVP assignments to be involved in discipline incidents regarding her son and she always made up the time. (R. 31, Pl.'s Facts ¶ 47.) On the other hand, Dixon – the

12

Dawes PVP coordinator – maintains that she was concerned with Friend's effectiveness as a PVP participant because she doubted that students would respect Friend after Friend witnessed the children being arrested on May 12, 1999. (R. 28-3, Def.'s Mot. for Summ. J, Ex. C, Dixon Aff. at 3; R. 28-2, Def.'s Facts ¶ 51.)

Once a plaintiff has crossed the threshold of voicing constitutionally protected speech, the Court must examine whether the dismissal is proper based upon a "full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick*, 461 U.S. at 150. The public employer's burden in justifying a dismissal depends on various factors, including:

> (1) the need to maintain discipline or harmony among co-workers; (2) the need for confidentiality; (3) the need to curtail conduct which impedes the [employee's] proper and competent performance of his daily duties; and (4) the need to encourage a close and personal relationship between the employee and his superiors, where that relationship calls for loyalty and confidence.

*Breuer v. Hart*, 909 F.2d 1035, 1039-40 (7th Cir. 1990) (quoting *Clark v. Holmes,* 474 F.2d 928, 931 (1972)). Also relevant is the level of public concern raised by the employee's speech and the time, manner and place in which the speech occurred. *Connick,* 461 U.S. at 152. If an employee's speech has the potential to be disruptive, the public employer has the ability to act quickly to remedy the situation and need not wait until the actual disruption occurs.[5] *Id.* at 154.

When applying these factors to the instant case, we find that Dixon's decision to

---

[5] Friend maintains that the proper analysis at this point is "whether the adverse action taken by the defendants is likely to chill the exercise of constitutionally protected speech." *Hesse v. Bd. of Educ. of Township High Sch. Dist., No. 211,* 848 F.2d 748, 752 (7th Cir. 1988) (quoting *McGill v. Bd. of Educ.*, 602 F.2d 774 (7th Cir. 1979). However, as *Hesse* clarifies, the "essence" of this test is determining whether the state employer was justified in terminating the employee. *Hesse,* 848 F.2d at 752. This involves the same considerations we laid out from *Breuer* and *Connick.*

13

terminate Friend, on behalf of Lalley and Dawes, was necessary for the PVP program to be operational and efficient. The nature of Friend's duties as a PVP participant required her to work closely with the children at Dawes. The police came to Dawes and arrested the children involved in the incidents with Friend's son after Friend spoke to the police. Moreover, Friend watched as the children were arrested. As such, this Court will not second-guess Dixon's recommendation that Friend be terminated based upon Dixon's belief that the children would lose respect for Friend as a PVP participant. We also conclude that Friend's continued employment as a PVP participant would likely have caused the students at Dawes to lose respect for the PVP as a whole. Thus, Dixon's determination that Friend's relationship with the Dawes' students was in jeopardy after May 12, 1999 is sufficient to justify Friend's dismissal. Therefore, even assuming *arguendo* that Friend's statements touched upon matters of public concern, we find that Lalley's interest in maintaining the effective operation of Dawes outweighed Friend's interest in her speech.[6]

## CONCLUSION

Although we sympathize with Friend's behavior, as a parent caring for her son, the record cannot reasonably be construed to support a determination that her speech was a matter of public concern, or that her interest in her speech outweighed Lalley's interest in maintaining the effective operation of the PVP at Dawes. Thus, for the reasons set forth in this opinion, we grant Lalley's motion for summary judgment, (R. 28-1), and deny Lalley's motion to strike as moot,

---

[6] Based upon the court's determination that Friend's speech was not constitutionally protected, we need not consider Lalley's assertion that Friend's job performance would have led to her termination, even in the absence of Friend's speech. *See Klunk v. County of St. Joseph*, 170 F.3d 772, 775 (7th Cir. 1992). For the same reason, we need not consider whether Lalley would have been entitled to qualified immunity.

(R. 34-1). The Clerk of the Court is instructed, pursuant to Federal Rule of Civil Procedure 58, to enter judgment in favor of Defendant Lalley and against Plaintiff Friend.

**ENTERED:**

**Judge Ruben Castillo**
**United States District Court**

**Dated: April 8, 2002**